UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No. 17-MJ-02962-GARBER

UNITED STATES OF AMERICA

v.

RAFAEL ARIAS
AYLEN GONZALEZ
ANA GABRIELA MURSULI CABALLERO
and
RAFAEL CABRERA,

        **Defendants.**
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003? ___ Yes  _X_ No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007? ___ Yes  _X_ No

Respectfully submitted,

BENJAMIN G. GREENBERG
ACTING UNITED STATES ATTORNEY

BY: _____
Angela Adams
Florida Special Bar No. A5502194
Trial Attorney
United States Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue NW
Washington, DC 20005
Tel: (202) 768-0967
Email: angela.adams@usdoj.gov

AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>RAFAEL ARIAS,<br>AYLEN GONZALEZ,<br>ANA GABRIELA MURSULI CABALLERO, and<br>RAFAEL CABRERA<br><br>*Defendant(s)* | )<br>)<br>)   Case No. 17-MJ-02962-GARBER<br>)<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __Dec. 2007 - Sept. 2015__ in the county of __Miami-Dade__ in the __Southern__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1349 | Conspiracy to Commit Health Care Fraud |

This criminal complaint is based on these facts:

☒ Continued on the attached sheet.

*Complainant's signature*
Jeffrey Hill, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __07/12/2017__

*Judge's signature*

City and state: __Miami, Florida__
The Honorable Barry L. Garber
*Printed name and title*

## AFFIDAVIT OF SPECIAL AGENT JEFFREY HILL
## IN SUPPORT OF CRIMINAL COMPLAINT

I, JEFFEREY HILL, hereby swear and affirm as follows:

### A.     Introduction

1.     I am a Special Agent with the Federal Bureau of Investigation, and I am currently assigned to the Miami Regional office. I have been employed in this capacity for approximately one month.  Prior to joining the FBI, I was a police officer with the Tampa Police Department. Prior to becoming a police officer, I worked with the Florida Department of Health as a Medical Malpractice Investigator.

2.     This affidavit is submitted in support of a criminal complaint charging **RAFAEL ARIAS, AYLEN GONZALEZ, ANA GABRIELA MURSULI CABALLERO,** and **RAFAEL CABRERA** with conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349.

3.     The facts contained in this affidavit are based on my personal knowledge and observations as well as facts related to me by other agents, inspectors, and team members.

4.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that the defendants committed certain acts that constitute the crimes as charged.  This affidavit does not contain all the facts of this investigation known to me or to other law enforcement personnel.  Rather, it sets forth only those facts necessary to establish probable cause in support of this criminal complaint.

At all times material to this affidavit:

1

**B.    The Medicare Program**

5.    The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

6.    Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b) and a Federal health care program, as defined by Title 42, United States Code, Section 1320a-7b(f).

7.    Medicare programs covering different types of benefits were separated into different program "parts." "Part A" of the Medicare program covered certain eligible home health care costs for medical services provided by a home health agency ("HHA"), also referred to as a "provider," to persons who already qualified for Medicare and who additionally required home health services because of an illness or disability that caused them to be homebound.

8.    CMS did not directly pay Medicare Part A claims submitted by Medicare-certified HHAs. CMS contracted with different private companies to administer the Medicare Part A program throughout different parts of the United States. In the State of Florida, CMS contracted with Palmetto Government Benefits Administrators ("Palmetto"). As administrator, Palmetto was to receive, adjudicate and pay claims submitted by HHA providers under the Part A program for

2

home health claims. Additionally, CMS separately contracted with companies in order to review HHA providers' claims data. CMS first contracted with TriCenturion, a Program Safeguard Contractor. Subsequently, on December 15, 2008, CMS contracted with SafeGuard Services, a Zone Program Integrity Contractor. Both TriCenturion and SafeGuard Services safeguarded the Medicare Trust Fund by reviewing HHA providers' claims for potential fraud, waste, and/or abuse.

9. Physicians, clinics and other health care providers, including HHAs, that provided services to Medicare beneficiaries were able to apply for and obtain a "provider number." A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries. A Medicare claim was required to set forth, among other things, the beneficiary's name and Medicare information number, the services that were performed for the beneficiary, the date that the services were provided, the cost of the services, and the name and provider number of the physician or other health care provider who ordered the services.

**Part A Coverage and Regulations**

**Reimbursements**

10. The Medicare Part A program reimbursed 100% of the allowable charges for participating HHAs providing home health care services only if the patient qualified for home health benefits. A patient qualified for home health benefits only if the patient:

(a) was confined to the home, also referred to as homebound;

(b) was under the care of a physician who specifically determined there was a need for home health care and established the Plan of Care ("P.O.C."); and

(c) the determining physician signed a certification statement specifying that the beneficiary needed intermittent skilled nursing, physical therapy, speech therapy, or a continued need for occupational therapy; the beneficiary was confined to the home; that a POC for furnishing services was established and periodically reviewed; and that the services were furnished while the beneficiary was under the care of the physician who established the P.O.C.

### C. Relevant Individuals and Entities

11. Sunshine Home Health Care Services, Inc. ("Sunshine Home Health"), located at 12488 SW 8th Street, Miami, FL, was a Florida corporation, incorporated on or about November 3, 2003, with its principal place of business in Miami-Dade County, in the Southern District of Florida. It purported to provide home health care services to eligible Medicare beneficiaries.

12. New Life Home HealthCare Inc. ("New Life Home Health"), located at 12260 SW 8th Street, Miami, FL, was a Florida corporation, incorporated on or about October 11, 2004, with its principal place of business in Miami-Dade County, in the Southern District of Florida. It purported to provide home health care services to eligible Medicare beneficiaries.

13. Nestor's Health Services, Inc. ("Nestor's Health Services"), located at 955 SW 122 Avenue, Miami, FL, was a Florida corporation, incorporated on or about January 6, 2006, with its principal place of business in Miami-Dade County, in the Southern District of Florida. It purported to provide home health care services to eligible Medicare beneficiaries.

14. Mildred and Marce Home Health Care Services, Inc. ("Mildred and Marce Home Health"), located at 11180 West Flagler, Suite 13, Miami, FL, was a Florida corporation, incorporated on or about April 19, 2007, with its principal place of business in Miami-Dade County,

in the Southern District of Florida. It purported to provide home health care services to eligible Medicare beneficiaries.

15. Bringas Home Health, LLC ("Bringas Home Health"), located at 7801 Coral Way, Miami, FL, was a Florida corporation, incorporated on or about July 20, 2006, with its principal place of business in Miami-Dade County, in the Southern District of Florida. It purported to provide home health care services to eligible Medicare beneficiaries.

16. City of Angels Home Health Care, LLC ("City of Angels Home Health"), located at 13170 SW 128 Street, Miami, FL, was a Florida corporation, incorporated on or about May 26, 2006, with its principal place of business in Miami-Dade County, in the Southern District of Florida. It purported to provide home health care services to eligible Medicare beneficiaries.

17. Excellence Home Health, Inc. ("Excellence Home Health"), located at 14850 SW 26th Street, Suite 111, Miami, FL, was a Florida corporation, incorporated on or about April 4, 2011, with its principal place of business in Miami-Dade County, in the Southern District of Florida. It purported to provide home health care services to eligible Medicare beneficiaries.

18. FDG Home Health Agency, Inc. ("FDG Home Health"), located at 7855 NW 12th Street, Miami, FL, was a Florida corporation, incorporated on or about June 23, 2008, with its principal place of business in Miami-Dade County, in the Southern District of Florida. It purported to provide home health care services to eligible Medicare beneficiaries.

19. PMC Medical Center, Inc. ("PMC Medical Center"), located at 1500 SW 27th Avenue, Miami, FL, was a Florida corporation, incorporated on or about March 26, 1993, with its principal place of business in Miami-Dade County, in the Southern District of Florida.

20. Merfi Corp., located at 42 NW 27th Avenue, Suite 301, and 4800 SW 8th Street, Coral Gables, FL, was a Florida corporation, incorporated on or about February 6, 2001, with its principal place of business in Miami-Dade County, in the Southern District of Florida.

21. Tri-County Rehabilitation Inc. ("Tri-County"), located at 225 NE 34th Street, Suite 211, Miami, FL, and 14141 NW 107 Avenue, Suite 301, Miami, FL, was a Florida corporation, incorporated on or about July 23, 2004, with its principal place of business in Miami-Dade County, in the Southern District of Florida.

22. **RAFAEL ARIAS** was a resident of Miami-Dade County.

23. **AYLEN GOZALEZ** was a resident of Miami-Dade County.

24. **ANA GABRIELA MURSULI CABALLERO** was a resident of Miami-Dade County.

25. **RAFAEL CABRERA** was a resident of Miami-Dade County.

26. A cooperating witness ("CW1") was the co-owner of Nestor's Health Services. In 2014, CW1 pled guilty, pursuant to a plea agreement, to participating in a kickback conspiracy at Nestor's Health Services.

27. A second cooperating witness ("CW2") was the co-owner of Excellence Home Health, L Medical Home Health, and FDG Home Health. In 2015, CW2 pled guilty, pursuant to a plea agreement, to participating in a health care fraud and wire fraud conspiracy at Excellence Home Health.

28. A third cooperating witness ("CW3") was the co-owner of Tri-County Rehabilitation Services. In 2015, CW3 pled guilty, pursuant to a plea agreement, to participating in a health care fraud conspiracy at Tri-County Rehabilitation Services.

29. A fourth cooperating witness ("CW4") was the sister of CW3 and the co-owner of Tri-County Rehabilitation Services. In 2015, CW4 pled guilty, pursuant to a plea agreement, to participating in a health care fraud conspiracy at Tri-County Rehabilitation Services.

30. A fifth cooperating witness ("CW5") was a patient recruiter and the former owner of multiple Miami-area home health agencies. In 2016, CW5 pled guilty, pursuant to a plea agreement, to participating in a health care fraud conspiracy at those home health agencies.

31. A sixth cooperating witness ("CW6") was the former owner of Merfi Corp. In 2013, CW6 pled guilty, pursuant to a plea agreement, to participating in a health care fraud conspiracy at Merfi Corp.

32. A witness ("W1") is a medical physician in the Miami-Dade area.

33. A second witness ("W2") is a resident of Monroe County, Florida.

### D. The Health Care Fraud and Kickback Conspiracies

34. Numerous cooperating witnesses have provided information to the investigative team regarding fraudulent activity and illegal bribes and kickbacks relating to home health services purportedly provided by various home health agencies that **ARIAS** owned and controlled. In to hide from Medicare the fact that he was the true owner of these home health agencies, **ARIAS** directed others to fraudulently represent to Medicare that they were, in fact, owned by others, and the home health agencies were issued Medicare provider numbers, which allowed them to submit

7

claims for services purportedly provided to Medicare beneficiaries even though many of the services were medically unnecessary or were obtained as a result of illegal bribes and kickbacks.

35. Cooperating witnesses further provided information that **GONZALEZ** was a patient recruiter who worked with **ARIAS** to refer Medicare beneficiaries to home health agencies that he owned and/or operated in exchange for illegal kickbacks. In order to facilitate the kickback schemes at the home health agencies, **GONZALEZ** purchased medically unnecessary prescriptions from Miami-area clinics. In late 2014, **GONZALEZ** purchased her own fraudulent clinic where she sold medically unnecessary prescriptions to other patient recruiters in exchange for illegal kickbacks. Many of the patients that were issued fraudulent prescriptions by **GONZALEZ's** clinic were purportedly treated by home health agencies that **ARIAS** owned and controlled.

36. Like **GONZALEZ, ANA GABRIELA MURSULI CABALLERO** worked as a patient recruiter and referred patients to at least one of the home health agencies that **ARIAS** owned and operated in exchange for bribes and kickbacks. **CABALLERO** also purchased medically unnecessary prescriptions from fraudulent medical clinics. In 2013, **CABALLERO** purchased a home health agency that she used to bill Medicare for home health services that were medically unnecessary or were obtained as a result of illegal bribes and kickbacks

37. **RAFAEL CABRERA** was a close friend of **RAFAEL ARIAS** who agreed to appear on the ownership paperwork for some of **ARIAS's** companies, in order to conceal **ARIAS's** true interest in those companies. Moreover, **CABRERA** received a significant amount of money from the fraudulent home health agencies that were owned and operated, at some point, by **ARIAS**, his friends, family, and business associates.

### 1.    RAFAEL ARIAS

38.    CW1 told federal agents that she and **RAFEAL ARIAS** owned Nestor's Health Services and that **ARIAS** had a practice of putting home health agencies that he ran in the name of his relatives instead of his own name.  CW1 explained that she and **ARIAS** agreed that Nestor's Health Services would be placed in CW1's name alone, even though the profits from Nestor's Health Services would be split 50/50 between them.  Additionally, **ARIAS** told CW1 that he put his niece as the owner of one of his other home health agencies.  CW1 also stated that one of **ARIAS's** brothers told CW1 that **ARIAS** put him (the brother) as the owner on the paperwork of one of **ARIAS's** home health agencies called New Life Home Health.

39.    CW2 stated that in 2012 or 2013, he sold **RAFAEL ARIAS** a home health agency called Excellence Home Health.  CW2 explained that, even though **ARIAS** was the true owner, **ARIAS** had another person act on his behalf at the closing.  CW2 further explained that after **ARIAS** purchased Excellence, CW2 and **ARIAS** decided to purchase a home health agency together called FDG Home Health.  **ARIAS** was not placed on the paperwork of FDG Home Health.  CW2 stated that **RAFAEL ARIAS** did not want to appear as the owner on the paperwork for any business because **ARIAS** did not want to be tied to anything that could have him arrested.

40.    CW2 also explained that **RAFAEL ARIAS** was the true owner of Bringas Home Health.  **ARIAS,** however, is not listed on the Florida Division of Corporations paperwork or the Medicare Application for Bringas Home Health.  CW2 told federal agents that, between 2013 and 2014, CW2 referred approximately 12-15 Medicare beneficiaries to Bringas Home Health at **ARIAS's** request.

9

41. In order to get patients admitted to **RAFAEL ARIAS's** home health agencies, **ARIAS** instructed CW2 to purchase home health prescriptions from PMC, a clinic owned by **AYLEN GONZALEZ**. At **ARIAS's** direction, CW2 took about 40 to 50 patients to PMC to obtain prescriptions even though the patients were not homebound. After obtaining the prescriptions, CW2's patients were admitted to **ARIAS's** home health agencies even though the patients did not need home health services.

42. CW5 told federal agents that **RAFAEL ARIAS** owned a home health agency called Sunshine Home Health. During 2008 through 2010, CW5 worked on behalf of patient recruiters who referred patients to Sunshine Home Health in exchange for bribes and kickbacks. CW5 explained that **ARIAS** allowed patients to be admitted to Sunshine Home Health even though the services were not medically necessary, as the patients were: not homebound; and were re-admitted to approximately every 3 months regardless of medical necessity.

   2.   **AYLEN GONZALEZ**

43. CW1 told federal agents that **AYLEN GONZALEZ** was a patient recruiter for Nestor's Health Services and that **RAFAEL ARIAS** introduced **GONZALEZ** to CW1 in approximately 2009 or 2010 for the purpose of referring patients to Nestor's Health Services in exchange for kickbacks. CW1 further explained that all of **GONZALEZ**'s patients were admitted to Nestor's Health Services approximately every 3 months regardless of whether or not they actually needed home health services.

44.     CW6 told federal agents that she was the former owner of Merfi Corp., a medical clinic operating in Miami, Florida. Merfi operated for the purpose of providing medically unnecessary prescriptions in exchange for illegal kickbacks.

45.     CW6 explained that, from around 2010 or 2011 until September 2013, **AYLEN GONZALEZ** was a patient recruiter who paid cash kickbacks to Merfi in exchange for medically unnecessary home health care prescriptions. According to CW6, **GONZALEZ** brought patients to Merfi on a daily basis totaling in the hundreds. These patients were cycled through Merfi for new prescriptions approximately every three months regardless of medical need. CW6 further stated that **AYLEN GONZALEZ** used these purchased prescriptions to refer Medicare beneficiaries to home health agencies, including Nestor's Health Services.

46.     The investigation revealed that Merfi ceased operating in September 2013, after CW6 was arrested. Subsequently, **AYLEN GONZALEZ** purchased and began operating her own clinic, PMC. **GONZALEZ** operated PMC for the purpose of issuing medically unnecessary home health prescriptions in exchange for cash kickbacks. Specifically, CW2 informed law enforcement that in approximately 2013 or 2014, CW2 took approximately 40 to 50 patients to **GONZALEZ's** medical clinic, PMC, to obtain home health prescriptions. CW2 explained that he paid **GONZALEZ** cash in exchange for home health prescriptions for patients that were not homebound.

### 3. ANA GABRIELA MURSULI CABALLERO

47. CW6 told federal agents that from approximately January 2012 through approximately September 2013, **ANA GABRIELA MURSULI CABALLERO** brought Medicare beneficiaries to Merfi Corp. to purchase medically unnecessary home health care prescriptions. According to CW6, **CABALLERO** purchased prescriptions from Merfi Corp. during this time period for approximately 200-300 patients. **CABALLERO** paid $100 to CW6 in exchange for each prescription.

48. CW4 (the sister of CW3 and former co-owner of Tri-County Rehabilitation) told federal agents that she and CW3 had an agreement with **ANA GABRIELA MURSULI CABALLERO** to refer patients to City of Angels Home Health, which was owned by **CABALLERO**, in exchange for kickbacks.

49. CW3 (the sister of CW4 and former co-owner of Tri-County Rehabilitation) CW3 further stated that the vast majority of patients she referred to **ANA GABRIELA MURSULI CABALLERO** at City of Angels were not homebound, but that **CABALLERO** accepted those patients anyway. In fact, **CABALLERO** instructed CW3 to coach the patients to lie about their physical condition to medical professionals in order to obtain home health prescriptions or to use a cane when going to the doctor.

50. CW4 told federal agents that sometimes, after **ANA GABRIELA MURSULI CABALLERO** had billed Medicare for home health services for a particular patient at City of Angels, the doctor who purportedly prescribed the services would come under review by Medicare,

and Medicare would not pay the claim. At **CABALLERO**'s direction, patient recruiters would take these patients to a different doctor to get a new prescription so that the services could be billed.

### 4. RAFAEL CABRERA

51. CW2 explained to agents that in approximately July 2014, CW2 purchased L Medical Center Inc. for approximately $200,000. CW2 borrowed the money to purchase L Medical Center from **RAFAEL ARIAS**. In return, **ARIAS** asked CW2 to place **RAFAEL CABRERA** on the paperwork as a manager for L Medical even though **CABRERA** was not actually the manager of L Medical Center. CW2 stated that **ARIAS** would often make **CABRERA** appear, on paper, as the owner or manager of **ARIAS's** companies even though he was not. For example, CW2 told agents that he and **ARIAS** decided to purchase a home health agency called FDG Home Health. **ARIAS** told CW2 that **CABRERA** would represent **ARIAS's** interest in FDG. **CABRERA** then agreed to appear, on paper, to have an ownership interest of FDG, even though he did not.

52. According to records maintained by the Florida Division of Corporations, on October 22, 2012, **CABRERA** was added as the Vice President, Secretary, and Registered Agent of Mildred and Marce Home Health. The March 1, 2013 Annual Report for Mildred and Marce Home Health identified **CABRERA** as the President of the company. On December 18, 2013, **CABRERA** was deleted from the corporate paperwork.

53. When interviewed by federal agents, W1, a medical doctor, explained that in 2013, he called Medicare to file a complaint because he received a home health prescription from Mildred and Marce Home Health for a Medicare beneficiary. The prescription purported to have his signature on it, but it was on a form he never used and for a patient he had never seen. W1

informed agents that the signature on the prescription was not his. W1 also received a plan of care for the same patient from Mildred and Marce Home Care. Medicare billing records indicate that Mildred and Marce Home Health submitted a claim for this patient for purported home health services for this patient. **RAFAEL CABRERA** was the President of Mildred and Marce Home Health when this false claim was submitted.

54. W1 also explained to agents that another Medicare beneficiary who purportedly received a prescription from W1 for home health services to be provided at Mildred and Marce Home Health, had not been referred to Mildred and Marce Home Health by W1. Medicare billing records indicate that Mildred and Marce Home Health submitted a claim for this patient for purported home health services for this patient. **RAFAEL CABRERA** was the President of Mildred and Marce Home Health when this claim was submitted.

55. A review of bank records indicate that between approximately November 2012 and October 2013, **RAFAEL CABRERA** received approximately $360,000 from Mildred and Marce. A further review of bank records indicate that **RAFAEL CABRERA** received a total of approximately $1.5 million from various home health agencies owned, on paper, by **RAFAEL ARIAS's** friends, family, and business associates, including Mildred and Marce Home Health.

### 4. Other Home Health Agencies purportedly owned, at some point, by RAFAEL ARIAS's friends, family members, or business associates

56. During the course of the investigation, law enforcement has identified at least eight home health agencies that were purportedly owned, at some point, by **RAFAEL ARIAS's** friends, family members, or business associates.

57. A review of the bank records has revealed money going from these home health agencies to **ARIAS** and **GONZALEZ**, in the below approximate amounts:

- A&C Home Health Care Inc. – purportedly owned by Marcelino Suarez Ferrer, a patient recruiter who recruited patients for **ARIAS** at Nestor's Home Health. **GONZALEZ** received approximately $217,000;

- Bringas Home Health LLC - purportedly owned by **RAFAEL CABRERA's** wife. **ARIAS** received approximately $474,000, and **AYLEN GONZALEZ** received approximately $79,000;

- City of Angels Home Health Care LLC – purportedly owned by **ARIAS's** niece and, subsequently, **CABARELLO**. **ARIAS** received approximately $75,000, and **GONZALEZ** received approximately $1 million;

- Colonial Home Health, Inc., purportedly owned by Marcelino Suarez Ferrer. **AYLEN GONZALEZ** received approximately $235,000;

- Empire Home Health Agency, Inc., purportedly owned by **ARIAS's** brother. **ARIAS** received approximately $6,000, and **GONZALEZ** received approximately $4 million;

- Healthy Life Home Care, Inc., purportedly owned by **ARIAS's** sister-in-law. **ARIAS's** wife received approximately $96,000, and **GONZALEZ** received approximately $196,000;

- Mildred & Marce Home Health Care Services, Inc., purportedly owned by Marcelino Suarez Ferrer and, subsequently, **RAFAEL CABRERA**. **ARIAS** received approximately $49,000, and **GONZALEZ** received approximately $2 million;

- Miami-Dade Home Health Care, Inc., purportedly owned by **ARIAS's** niece. **ARIAS** received approximately $129,000, and **GONZALEZ** received approximately $547,000.

58. The money identified above as going to **GONZALEZ**, was money made out in check to companies owned by **GONZALEZ** or **GONZALEZ's** mother.

15

F.  **Conclusion**

WHEREFORE, based upon the above information, I believe probable cause exists that, in Miami-Dade County, in the Southern District of Florida, **RAFAEL ARIAS, AYLEN GONZALEZ, ANA GABRIELA MURSULI CABALLERO,** and **RAFAEL CABRERA** did knowingly and willfully commit the crimes as charged herein.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

_____
JEFFEREY HILL, SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

SWORN AND SUBSCRIBED TO BEFORE ME
ON THIS _12_ DAY OF JULY 2017, IN MIAMI, FL:

_____
UNITED STATES MAGISTRATE JUDGE

16